Filed 12/19/22  C.M. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| C.M., | |
| Petitioner, | E079767 |
| v. | (Super.Ct.No. RIJ1200143) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mona M. Nemat, Judge.  Petition denied.

Office of the Juvenile Defense Panel and Ramiro Torres Campos for Petitioner.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Real Party in Interest.

No appearance for Respondent.

1

The juvenile court terminated petitioner, C.M.'s (mother), reunification services as to C.F. (the child), and set a Welfare and Institutions Code section 366.26[1] hearing. Mother contends insufficient evidence supports the court's finding that real party in interest, Riverside County Department of Public Social Services (the department), offered her reasonable reunification services. The petition is denied.

## I. FACTUAL AND PROCEDURAL HISTORY

On February 9, 2021, personnel from the department received an immediate response referral alleging domestic violence. The parents got into an argument while the child was nearby. A.F. (father)[2] pulled out a knife and threatened to kill mother if she took the child. Mother picked up the child and sat on the bed. Father held out the knife, held mother by the neck, and threatened to kill her. Father reportedly strangled mother throughout the day.

Mother reported there is constant domestic violence in the home. Father was arrested for felony domestic violence, terrorist threats, assault, and child endangerment. Mother did not want to call law enforcement when incidents occurred. She did not want to press charges and declined an emergency protective order.

The department had six previous referrals regarding mother. In one referral, on February 12, 2012, mother and the father of her older children (D.M.) were involved in an argument that escalated into a physical altercation while in the presence of the child's

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this petition.

2

sibling. D.M. pushed mother to the ground and bit her twice. D.M. was arrested and charged with felony corporal injury on a spouse and misdemeanor child endangerment.

On January 6, 2021, department personnel received a referral for general neglect and physical abuse, reporting that the parents were constantly screaming and yelling at each other in the presence of the child. The social worker referred both parents to counseling services to address domestic violence.

The social worker gave mother "specific recommendations and referrals . . . to file a restraining order against the father for the safety and protection of herself and the child. The mother was provided with the phone number to Project Touch for housing assistance, [the department] for cash aid assistance, and the mother was referred to Alternatives to Domestic Violence for victim's classes. The mother was provided with a [department] resource packet. The mother was notified that lack of follow through could result in further involvement by the Department."

On February 12, 2021, mother notified the social worker that she was enrolled in housing services. The social worker confirmed her enrollment. However, on February 24, mother notified the social worker that she had transferred to a shelter that offered more services such as therapy and domestic violence classes all in a program that mother felt was a better fit for her. The social worker noted that mother could remain at the shelter and participate in their program until April 26, when she could then move into a transitional housing program.

On February 16, 2021, mother filed for a restraining order against father with a court date of March 4; however, mother failed to attend the court hearing.

On March 8, 2021, a counselor at the shelter reported that mother was picked up by "an adult male" over the weekend. Mother, the child, and the man were in the parking lot. Mother was asked by the shelter manager whether she was okay. The man became aggressive and made threatening comments to the shelter manager.

On March 8, 2021, the social worker met with father at his home. Father reported he had spoken to mother approximately four days earlier, and they came to an agreement to handle the situation "'like adults and keep it our business and keep the courts out of it,'" referring to mother's failure to appear in court for the restraining order. Father reported he was aware mother and child were in a shelter because mother told him, but he denied seeing her.

On March 10, 2021, the social worker spoke to the shelter staff who confirmed mother and child were picked up by a man described as "having braids and tattoos on his face." The social worker noted that father "has braids and tattoos on his face." The staff person asked mother if she was okay; the man responded, "'mind your business or I'll blow your face off.'" Mother denied having any contact with father.[3] On March 11, father admitted to going to the shelter and threatening someone.

On March 12, 2021, department personnel filed a section 300 petition alleging that the parents engaged in ongoing acts of domestic violence (b-1); that mother had a history with the department including prior substantiated acts of domestic violence (b-2); that mother had a criminal history, with a currently active warrant (b-3); that father abused

_____

[3] A court executed a criminal protective order on February 16, 2021, prohibiting father from having contact with mother.

controlled substances (b-4); and that father had an extensive criminal history (b-5). On March 15, 2021, the court detained the child.

In the jurisdiction and disposition report filed April 1, 2021, the social worker recommended the court remove the child from mother's custody and grant her reunification services. Mother had started counseling; she was on the waitlist for parenting education and domestic violence classes for victims. Mother's prospective case plan included domestic violence classes, general counseling, parenting education, a substance abuse assessment, and substance abuse testing.

In an addendum report filed April 30, 2021, the social worker noted that mother stated she was enrolled in domestic violence classes at the shelter, and mother reported being enrolled in weekly counseling.

On April 28, 2021, mother stated she was not enrolled in any services. Mother stated she had sent her information to an alternatives to domestic violence program and was waiting for a call back to be enrolled in counseling, parenting education and classes, and anger management. Mother stated she would provide contact information for her case plan when enrolled. On April 29, 2021, the social worker contacted the shelter case manager who reported mother had not signed into the shelter for the last two days. The case manager stated that if mother did not sign in that day, she would be released from the program.

At the contested jurisdiction and disposition hearing on May 6, 2021, the court sustained the petition, found the allegations in the petition true, removed the child from the parents' custody, and granted mother reunification services. The court struck the

5

substance abuse assessment and testing components of the prospective case plan. The court directed the department "to provide Mother with assistance and housing, both nonfinancial and financial," and "have the social worker follow up with Mother who may need further assistance trying to get into the alternative domestic violence program."

In the status review report filed October 15, 2021, the social worker recommended the court continue mother's reunification services. Mother began counseling in March 2021, and continued in weekly sessions. Mother's therapist reported that mother was "consistent in participation and . . . open to learning and growing from her experiences." On April 16, 2021, mother began "Triple P Parenting, through Alternatives to Domestic Violence." Mother reported that she had completed the program and was waiting to receive her certificate.

On October 12, 2021, an advocate at the alternatives to domestic violence program, informed the social worker that mother missed her final individual session for the program, and as soon as it was completed, she would receive her certificate. The social worker informed mother of the requirement, and mother promised to call the next day.

On May 6, 2021, mother enrolled in the alternatives to domestic violence program. Since enrolling, she had attended 11 group sessions and two individual sessions. She had one individual and one group session remaining to finish the program. She was expected to complete the program on October 14.

Visits between the child and mother were supervised by the department. Mother consistently visited the child twice weekly for two hours. It was reported that during two

of the visits, mother smelled of marijuana and spent "a lot" of time in the bathroom. There were also a few occasions when mother was very late, and she became "very angry" when the visit was canceled. Mother resorted to aggression on at least one occasion by "hitting the elevator and banging on the front doors to the office." Mother was counseled on the visitation rules and given a chance to adjust the visitation times so that she could have better control over her ability to arrive on time.

On October 29, 2021, mother's counsel reported that she had completed her domestic violence course. She was attempting to obtain her certificate from her parenting class, but her phone calls were not being returned.

In an addendum report filed December 6, 2021, the social worker reported that mother had progressed to six hours of unsupervised visitation; the first overnight visit was being planned. On December 10, 2021, the court continued mother's services for another six months.

In the status review report filed on April 11, 2022, the social worker recommended the court continue mother's reunification services. Mother continued weekly counseling; her counselor reported she was "consistent in participation and learning and is open to learning and growing from her experiences." Mother reported that she had completed a parenting program and was awaiting her certificate. The parenting advocate reported that mother had "missed her final individual session for the program and that as soon as it [was] completed, she [would] receive her certificate." The parenting advocate later said that the person with whom mother had completed the program was no longer with the

organization, and mother would have to repeat the class to obtain a certificate. Mother completed a domestic violence program on October 14, 2021.

Mother visited consistently with the child. They had one overnight visit. No further overnight visits were scheduled because mother delayed setting up a crib for the child, had improperly installed the child's car seat, had been driving the child without a driver's license, had not been meeting timely with the caregiver to exchange the child, had placed minor in the maternal grandmother's care without authorization, and repeatedly returned the child to the caregivers in a "very dirty" condition with small injuries.

At the status review hearing held on April 22, 2022, minor's counsel asserted that mother had completed her services. Minor's counsel requested more overnight visits and a contested status review hearing. Mother's counsel joined minor's counsel's request. The court set the matter for a contested hearing on whether to give mother unsupervised, overnight and weekend visits.

In the May 26, 2022, addendum report, the social worker noted that "mother's case plan included General Counseling, Parenting Education, [and] Domestic Violence Education . . . . The mother has successfully completed Domestic Violence [education] . . . . She [was] actively participating in general counseling . . . and her counselor . . . continue[d] to report that the mother [was] engaged and open in sessions. As to the parenting education, [the social worker] was able to verify that the mother did attend all of the classes . . . . The mother and the Department discussed providing an in-

home safety parenting course (SafeCare) for the mother once the child is returned to her care in lieu of repeating the previous class."

The social worker scheduled weekend visits to begin on May 27, 2022. "The Department would like to assess the outcome of the weekend visits for a few weeks before returning the child to the mother's care."

In the addendum report filed June 8, 2022, the social worker recommended mother undergo a mental health evaluation. On May 28, 2022, a referral was received by the department alleging general neglect because the child had been admitted to a pediatric intensive care unit. The referral alleged that "mother failed to adequately supervise the child during a weekend visitation, and the child accidentally ingested a hypoglycemic medication causing the child to be hospitalized in critical condition."

The social worker responded to the hospital where it was reported that the child "remained hypoglycemic, and they could not control her sugar levels without using a drip line." The doctor said the child's "condition was an acute condition, [from] either ingesting a diabetic medication, or possibly being injected with insulin."

A doctor "recommended blood work that would test for [the] possible overdose of insulin, and detect whether or not an antihyperglycemic medication was ingested." A nurse reported that mother was uncooperative "with the draw and stated the mother would only allow them to draw blood at the next hourly draw." The blood draw was time sensitive because the child's body would completely process the insulin in her system within a certain amount of time. It had been at least 14 hours since the onset of her symptoms prior to her arrival at the hospital.

9

A doctor reported that mother "repeatedly tried to decline and block required medical [attention] for the patient such as hourly blood glucose checks. Her behavior escalated [requiring] persistent efforts on the part of the staff to explain the need for the ordered medical care. Security was called and it seemed that [mother] did calm down. However, after efforts to draw blood for required testing, [mother] would not allow the staff to try to draw blood again. At this time [mother] used words and actions that made the staff feel unsafe in caring for the [child]. She hovered very close to the [child] while she yelled at the staff using foul language. She stated emphatically that she was trying to calm her child while the [child] was laying calmly in the bed without crying or fussing. Mother was removed from the room."

The social worker greeted mother at the hospital and asked to "meet in private as the medical staff needed to conduct testing on [the child]. The mother refused to leave the room and refused for [the child] to be treated. The mother stated [the child] had her blood drawn about an hour ago and she did not want [the child] to be 'poked every five minutes.' . . . [¶] . . . [¶] . . . The mother continued to escalate [the situation,] and as [the nurse] attempted to draw the blood, the mother began yelling profanities at [the nurse], 'She better fucking do her job right the first time because she is not poking my daughter again.'" Mother hovered over the nurse while she was drawing the child's blood, continuing to yell profanities at her.

The social worker was concerned about mother's behavior and asked her to drug test, which upset her. Mother tested negative. Mother continued to yell and use profanity.

The social worker interviewed the maternal grandmother and aunt. They reported the child was behaving normally when mother put her to bed at 1:00 a.m.; the child awoke crying at 2:30 a.m., shaking and convulsing; her crying did not sound normal; however, this did not last long, and the child fell back to sleep. She awoke and exhibited the same symptoms, once at 3:30 a.m. and again at 4:00 a.m. At 4:00 a.m. her eyes were blinking quickly. Mother called 911.

Mother, the maternal grandmother, and the maternal aunt all blamed the child's symptoms on a blood draw conducted on the child a week earlier testing for lead in her system. The maternal grandmother reported she kept her diabetes medication on top of the refrigerator. She denied her diabetes medication could have caused the issues.

A nurse at the hospital reported "that she had entered the room soon after the mother and baby arrived and there was a male voice on speaker, he was yelling and using profanity to the mother about getting the baby lunch and accusing the mother of not taking care of the child properly. The mother then told [the nurse,] 'please excuse the dad, he doesn't have any house manners.'" Father denied any contact with mother since the instant proceedings began.

The child was released from the hospital on May 31, 2022. "On June 7, 2022, the lab results for a hypoglycemic panel were received . . . . The results conclude that at the time of the blood draw, there were no hypoglycemic medications in [child's] system. . . . If the medication . . . was ingested, it would reach maximum concentration between 1.5 and 4.5 hours after ingestion. If it was an extended release dose, it would reach maximum concentration in 3.5 to 7 hours after dosing. As [the child] began showing

11

symptoms at 2:30 a.m. on May 28, 2022, it is highly likely that the medication would no longer show in the system by the time the blood was drawn at 1:10 p.m. on May 29, 2022, nearly 35 hours after the initial symptoms."

A doctor noted that the child's hospital "admission is extremely concerning for severe neglect and poor supervision. Mother's aggressive behavior is also extremely concerning and will require further evaluation by [the department] to determine [the] safety of [the child] while she is under mother's care."

In an addendum report filed June 17, 2022, the social worker recommended the court continue mother's reunification services and require mother to submit to a psychological evaluation. The social worker recommended visitation be reduced to supervised.

The social worker noted that the child was healthy before her unsupervised visit with mother, presented symptoms for about 24 hours, and then again is a healthy child. "[I]t is the Department's conclusion that the cause of this episode was accidental ingestion of a hypoglycemic medication. It was reported by one of the forensic pediatricians that in a child this young it would only take one pill of this type of medication to cause this severe reaction and presentation of symptoms. We will not be able to ascertain evidence of the exact cause of the incident as there are no eyewitnesses and the child has returned to her previously healthy state."

The social worker further noted: "In speaking with Riverside County Sherriff personnel about the incident, the 911 call log shows that the paramedics considered calling law enforcement to help them diffuse the mother so that they could take the child

12

to the hospital, but that they were eventually able to take the child without police intervention."

The social worker opined mother's actions appeared "to be outside rational thinking and a fixation on fantasy reaction . . . , and that the mother should receive a psychological evaluation to see if there are any underlying mental health conditions that the mother should receive treatment for. A further argument for the need of this evaluation is that the mother reported . . . that 'I have never had a child in the system before, this is all new to me.' In fact, the mother has two older children who were dependents in 2012. These children were ultimately placed in the care of their father, and it is unknown if the mother has a relationship with them now."

At the hearing on June 17, 2022, counsel for the department requested the court "order that mother complete to a psychological evaluation. . . . We're asking mother to participate in SafeCare . . . , so we ask that the Court order a referral for that, as well." Minor's counsel noted: "I'm in agreement with the psychological evaluation for mother and SafeCare. . . . [¶] . . . [¶] [W]ith regard to the unsupervised visits, I don't have necessarily [an] objection to them. But I would certainly ask that they start out in short duration."

Mother's counsel responded: "Mother does not deny the factual events. However, she would like to communicate to the Court that it was quite an overwhelming experience for her, for the minor, and to all accounts, she was there alone. A lot of people were talking to her, security was brought in the room, and she recognizes she could have done better. [¶] For those reasons, she is here, willing to comply with the Department,

13

receptive to their recommendations for a psychological evaluation, receptive to a recommendation for a parent-partner. So the mother is here working on herself [and] working on reunification . . . ."

The court found that "more likely than not . . . the minor picked up the pill, a diabetic pill of grandmother's, by accident. No one probably had a clue that that occurred. And that, you know, as a result, the minor had circumstances that required medical attention, and thankfully, mother did contact paramedics through 911 emergency to give assistance." The court continued mother's reunification services and ordered her to complete a psychological evaluation. The court also ordered that "a SafeCare referral be provided to mother [to] provide mother with some additional assistance."

In the status review report filed on August 15, 2022, the social worker recommended the court terminate mother's reunification services. The social worker reported: "On June 17, 2022, a referral for psychological testing was submitted on behalf of [mother]. On June 23, 2022, [mother] was informed that she was referred to Family Matters Counseling for this service and provided with the address and phone number to make an appointment. [Mother] reported that her appointment was for June 29, 2022, at 10 a.m." On June 29, 2022, the social worker "received an email . . . informing [her] that [mother] did not show for her scheduled appointment." The social worker "attempted to contact [mother] and learned that her phone was out of service. [¶] On July 7, 2022, [mother] and [the social worker] communicated by text where [mother] reported that she forgot about the appointment and offered to make another appointment the next day. On July 8, 2022, [mother] reported that her new appointment was for July 27, 2022, at

14

10 a.m." On July 27, 2022, the social worker "confirmed with Family Matters that [mother] did attend her appointment and complete[d] her testing. As of the writing of this report the results are not yet available."

With respect to visitation, the social worker noted: "Since June 17, 2022, the mother has visited weekly with the child, however she frequently cuts the visits short by an hour or more, or has canceled the visit at the last moment on three occasions for different reason[s]. The mother is frequently late for visits, citing bus schedules as the reason. The mother is allowed to set the time of the visits based on her own schedule and has been asked to factor in the bus ride, but continues to be a half hour to an hour late for visits. On a supervised visit with the mother on July 8, 2022, the mother fell asleep with the baby on her lap . . . ."

At the hearing on August 26, 2022, to confirm the contested hearing, mother's counsel noted: "She's enrolled in all of her services. She's enrolled in SafeCare. She's working with a parent-partner. She's completed a psychological evaluation, attending visits. So, again, she's enrolled in all the services." Counsel for the department observed: "I do note that we have a psychological evaluation pending. If the Court would authorize an addendum the day before the hearing, sometimes we are able to secure a copy of the results." The court authorized the request.

In the addendum report filed September 8, 2022, the social worker noted that the psychologist diagnosed mother as "Bipolar 1, with psychotic features, with mood-congruent psychotic features. In addition, it was found that the mother has a 'high probability' of a substance abuse disorder and the mother admits to using alcohol and

15

marijuana as stress relievers. The evaluator recommended that the mother be monitored during her visits with her child." The social worker opined: "The psychological evaluation of the mother gave us insight to her behavior and raises further concerns for the child's safety due to the mental health diagnosis that is still untreated and the high probability of a substance abuse disorder. The mother has made progress in her case plan, but has been unable to finish her services. It is not likely that the mother will be able to make the changes that would ensure the safety and well-being of the child."

The psychologist's report, attached to the addendum report, recommends that mother attend "outpatient therapeutic services in order to assist her in gaining skills for improving sense of self, which may have positive impacts on her ability to appropriately engage with most others, using effective communication strategies, minimizing conflicts, and improving interpersonal relationships."

At the contested hearing on September 12, 2022, mother's counsel requested the court extend the time for reunification services pursuant to section 352: "I argue at this point, those extraordinary circumstances exist, as my client has recently been diagnosed bipolar 1, an evaluation, a psychological evaluation which was conducted on July 27th. The Department has known of the psychological evaluation or reasonably should have known about it since August 1st. [¶] . . . [¶] . . . Nevertheless, the Department has failed in that they did not provide mother with additional referrals to get a medication evaluation assessment and afford the mother the opportunity to become medication compliant. [¶] . . . [¶] Again, I restate, the Department has known about the mother's psychological evaluation diagnosis since August 1st. We are now at September 12th,

16

more than 40 days. And the Department did not address this diagnosis with the mother, nor did they help her get medication. Potentially, the mother has been struggling this whole time with services due to her mental health illness, and the Department did not assist her."

Counsel for the department responded: "Your Honor, to the other point that [mother's counsel] makes that somehow this mental diagnosis is an extraordinary circumstance, again, I don't see it as the determining factor in this case. When we look at mother's progress, she was ordered to continue counseling. She is in counseling. She was ordered to complete SafeCare. That referral was initiated almost immediately, forthwith. Mother began her sessions in July. She had her second session in August, a full month later."

Mother's counsel replied: "[M]other's late or rather recent diagnosis for bipolar 1 is an extraordinary circumstance which can be considered by the Court to continue the 18-month hearing. The fact that the mother has mental illness is likely indicative of her behavior. And it is an answer to the Department's concerns which arose in late May during the incident in which the minor may have ingested medication. . . . [¶] . . . Mental illness has been flaring up, popping up, causing her to struggle when taking on visits, when taking on services. [¶] I mean, I'm not an expert, but I'm thinking perhaps the mental illness could have an effect on mother being on time, organizing better, being prepared. Something needs to be determined. And if the mother was provided medication and the mother was allowed to stabilize, I believe that it's very likely the mother would have a better performance."

17

Minor's Counsel noted: "[M]other has been engaged in the case plan this entire time and has been engaged in therapy. As both [counsel] noted, she has been engaged in that therapy consistently. So if mother had an issue with regard to her mental health resurfacing and the inability to maintain stability on it, she did have the ear of the Department. She had the ear of her therapist in order to enhance services and change [them]."

The court observed: "This was a psychological evaluation ordered in June. There was a reason for that evaluation to be ordered. And now that we have the results of that evaluation, I think that it behooves us to allow for stabilization at least minimally to see if that is, in fact, the underlying cause." Nonetheless, the court concluded: "I don't necessarily disagree with [mother's counsel]. But at this point, I think that we need to move this case along. And it's not even about moving the case along. In looking at the history of this case, it has been 18 months. I understand that your argument is, well, the bipolar may be the genesis of all the reasons why she has not been necessarily completely compliant and missing visitations and all of that. And she needs a few more months to get stabilized is really what your argument is. [¶] While I appreciate that, at this point, I think . . . it's not an extraordinary circumstance in and of itself given the structure of this case. And for that reason, at this point, I need to go ahead and terminate family reunification as to mother." The court terminated mother's reunification services and set the section 366.26 hearing.

18

## II.  DISCUSSION

Mother contends insufficient evidence supports the court's implicit finding that reasonable reunification services were offered to Mother.  Specifically, mother contends that the department should have obtained and known about the results of the psychological evaluation at an earlier date, and the department failed to provide a referral for medication assessment services to enable her to become medication compliant.

"'The paramount goal in the initial phase of dependency proceedings is family reunification.  [Citation.]'  [Citation.]  'At a disposition hearing, the court may order reunification services to facilitate reunification between parent and child.'  [Citation.] Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.'  [Citation.] Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.'"  (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.)

The department "'must make a good faith effort to develop and implement a family reunification plan.  [Citation.]  "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . ."  [Citation.]'  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'  [Citation.]  'The applicable

standard of review is sufficiency of the evidence.'" (*In re T.G.*, *supra*, 188 Cal.App.4th at p. 697.)

"There is a split of authority in case law whether the juvenile court must observe the 18-month deadline for setting a section 366.26 placement hearing when reasonable services have not been provided." (*In re M.F.* (2019) 32 Cal.App.5th 1, 21 [concluding that the juvenile court must continue services to the 24-month review date when it finds reasonable services were not provided]; contra, *Michael G. v. Superior Cou*rt (2021) 69 Cal.App.5th 1133, 1143, fn. 5, review granted Jan. 19, 2022, S271809 ["[A] court only has the ability to extend reunification services past the 18-month mark . . . where the parent is a minor or dependent parent, in a court-ordered substance abuse treatment program, or recently discharged from incarceration, institutionalization, or DHS custody . . . not in any and all cases where reasonable services were not offered."].) In *In re M.F.*, at pages 23-24, the court found that section 352 is irrelevant to a determination of whether to extend services.

Sufficient evidence supports the court's determination that the department offered mother reasonable services. First, mother was at least partially responsible for the delay in the department obtaining the psychological evaluation. On June 17, 2022, the court ordered mother to undergo a psychological evaluation. Mother made an appointment for the evaluation to occur on June 29 but failed to appear for the appointment. The social worker attempted to contact mother to get her to reschedule the appointment, but mother's cell phone was inoperative. Mother eventually rescheduled for July 27. Thus, mother's actions delayed the psychological evaluation by a month.

20

Second, although mother claims in her petition that she should have received "a referral for medication assessment [and] services to enable [her] to become medication compliant," the psychological evaluation did not make this recommendation. Instead, the psychologist recommended that mother attend "outpatient therapeutic services in order to assist her in gaining skills for improving a sense of self, which may have positive impacts on her ability to appropriately engage with most others, using effective communication strategies, minimizing conflicts, and improving interpersonal relationships." As minor's counsel noted at the hearing held on September 12, 2022, mother was already receiving weekly counseling. Thus, mother would appear to have been receiving the very services recommended by the psychologist; albeit, without the psychological diagnosis.

Third, none of the reasons for the dependency were mother's mental health issues. (*In re T.G.*, *supra*, 188 Cal.App.4th at pp. 696-697 [department to identify the problems that led to the loss of custody and offer services designed to remedy those problems].)

Fourth, mother received substantial services directed at remedying the reasons that led to the dependency proceedings, including services directed at her mental health. Mother also received directions on how to file a restraining order against father, contacts for housing assistance, cash aid assistance, and a referral to alternatives to domestic violence victim classes. Mother began counseling in March 2021, and continued in weekly sessions during the entirety of the proceedings. She participated in the "Triple P Parenting" program, completed an alternatives to domestic violence program, enrolled in "SafeCare," an in-home parent training program, and was working with a parent-partner. Also, the court ordered a psychological evaluation "to see if any other services" were

21

needed for mother to complete her case plan.  Thus, sufficient evidence supports the court's finding that the department offered mother reasonable services.

### III.  DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER _____
J.

We concur:


RAMIREZ _____
P. J.


MENETREZ _____
J.